# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

ERNEST GARNER,

    Plaintiff,

v.                                                          Case No. 16-12908

GERBER COLLISION & GLASS and
JOHNATHAN BARNES,

    Defendants.
_____/

## OPINION AND ORDER GRANTING GERBER'S MOTION FOR SUMMARY JUDGMENT AND GRANTING BARNES'S MOTION FOR SUMMARY JUDGMENT

Pending before the court are separate motions for summary judgment filed by Defendants Gerber Collision and Glass ("Gerber") and Johnathan Barnes. (Dkts. ##27, 28.) The motions are completely briefed (Dkts. ##38, 39, 41, 42), and the court concludes that no hearing is necessary. *See* E.D. Mich. LR 7.1(f)(2). For the following reasons, the court will grant both motions.

## I. BACKGROUND

Gerber is a full-service automotive collision repair facility where Plaintiff Ernest Garner worked first as a customer service representative, then as a parts coordinator, and finally as parts manager, all under the direct supervision of Defendant Barnes. During this time Plaintiff, who is African American, was the unwilling butt of a number of racially charged jokes by his coworkers.[1] Plaintiff claims that these jokes often occurred

---

[1] The court does not find it necessary to catalogue in detail all of the abuse allegedly directed at Plaintiff. As much of it was recorded, the parties dispute little of the contents of the pertinent statements. Instead the court will content itself with a summary and

in the presence of Barnes, and it is undisputed that a few times Barnes was the source of the abuse. Barnes suggests that his jokes were entirely innocuous and lacked any racial components. For example, he contends that his statements to Plaintiff that "of course the black guy gets the chicken" and "[c]alm down, you know it's not chicken[;] we know that's what you're used to" were references to his knowledge that "Plaintiff loved chicken as his favorite meat, even enjoying chicken as the family Thanksgiving treasure[,]" rather than to offensive racial stereotypes.

Plaintiff began surreptitiously recording his interactions with his coworkers, and eventually complained to Human Resources via phone. Approximately an hour later, two higher-ups from Gerber appeared to investigate, resulting in an outwardly contrite Barnes offering apologies to Plaintiff and promising to take steps to prevent future abuse. Plaintiff believes these measures were never implemented, and that at least one coworker continued to pantomime references to Adolf Hitler at him after this meeting. Plaintiff also alleges that he was given more work than similarly situated white counterparts, that when he was promoted he was not given a matching pay increase that normally attends promotions of white co-workers, and that none of this harassment or discrimination would have occurred in the first place had he been white.

Some weeks later, Plaintiff discovered a racial slur written on the back of his truck in red or pink colored paint pen. He alleges that when he reported this to management along with a photograph, he was not taken seriously. He says that they instead jokingly expressed their admiration of the beautiful handwriting used. Plaintiff then resigned from

describe specific facts where they are relevant.

Gerber without awaiting the result of any investigation, and he did not return despite entreaties from upper management that he accept a transfer to a different location. Plaintiff admits that he is not certain whether a Gerber employee vandalized his truck. His complaint alleges claims for racial discrimination and racial harassment under the Michigan Elliot-Larsen Civil Rights Act ("ELCA"), ethnic intimidation under M.C.L. § 750.147b, race discrimination and harassment under Title VII, retaliation, and intentional infliction of emotional distress, requesting over $1,000,000 in damages as well as injunctive relief.

Gerber moved for summary judgment, arguing that Plaintiff's claims for racial harassment under Title VII and the ELCA fail because Gerber's energetic response to Plaintiff's complaint means that he cannot show that Gerber tolerated or condoned the harassment and thus had failed to take corrective or preventative action—a requirement to establish a prima facie claim. Gerber also asserts that Plaintiff cannot prove claims for retaliation or discrimination because he suffered no adverse employment action as he voluntarily terminated his employment of his own accord after Gerber tried to resolve his complaints about harassment. Gerber also contends that Plaintiff's allegations of pay discrimination are unsubstantiated as he cannot identify similarly situated employees of another race who were paid more than he was. Gerber insists further that Plaintiff's claim for ethnic intimidation fails because his "vague allegation" of threats was insufficient, and he has not shown personal injury or property damage. Finally, Gerber argues that the claim for intentional infliction of emotional distress cannot succeed because the complained-of conduct does not rise to the level of conduct "so outrageous in character,

and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious, and utterly intolerable in a civilized community[,]" as required under *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905 (1985).

Defendant Barnes also moved for summary judgment. He argues that Plaintiff cannot succeed on his Title VII claims because Barnes was his supervisor, not his employer. He goes on to state that Plaintiff cannot establish claims for retaliation because his decision to voluntarily quit cannot be viewed as an adverse employment action, and Barnes, far from discriminating against Plaintiff, recommended him for several promotions. Barnes contends that Plaintiff's racial harassment claim fails because the complained-of conduct never rose to the necessary level of hostility and was corrected upon Plaintiff's formal complaint. Like Gerber, Barnes also insists that Plaintiff's ethnic intimidation claim is faulty because Barnes never had physical contact with Plaintiff, did not damage his property, and did not threaten to do so. Finally, he argues that Plaintiff's allegations do not constitute the outrageous conduct necessary to establish a claim for intentional infliction of emotional distress.

Plaintiff's responses to both motions are nearly identical. First, he contends that he was indeed subjected to harassment and discrimination, and that knowledge of this treatment should be imputed to Gerber since Plaintiff's supervisor, Barnes, either knew about or participated in the conduct and failed to take any action to prevent it. He argues that he was forced to do more work for less pay than similarly situated employees, and that, far from voluntarily quitting, he was constructively discharged from his position in virtue of the intolerable conditions. He claims to have suffered emotional distress from

his treatment at Gerber, and also that the failure of Defendants to meaningfully respond to his complaints constitute an adverse employment action sustaining a claim for retaliation. Plaintiff insists that Defendants "acquiesced" to threats constituting ethnic intimidation. Finally, he offers that the harassment he endured was, in fact, sufficient to satisfy the standard for outrageous conduct supporting intentional infliction of emotional distress.

Defendants' reply briefs are very similar. They both argue that Plaintiff admits Gerber took "prompt remedial action to rid the workplace of any alleged discriminatory or harassing conduct, after which the alleged harassment ceased." Defendants claim that because Gerber took reasonable steps to address any misconduct once Plaintiff reported it, Defendants cannot be held responsible. They offer further that Plaintiff has no support for his belief that he was paid less than similarly situated workers or for his ethnic intimidation and emotional distress claims. They also contend that the conditions of Plaintiff's employment were not sufficiently "intolerable" to constitute the adverse employment action of constructive discharge.

## II. STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003). The movant has the initial burden of showing the absence of a genuine dispute as

to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]hat burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (internal quotation marks omitted).

The burden then shifts to the nonmovant, who must put forth enough evidence to show that there exists "a genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citation omitted). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). In evaluating a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial . . . credibility judgments and weighing of the evidence are prohibited." *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015) (internal quotation marks and citations omitted).

### III. DISCUSSION

#### A. Whether Plaintiff May Recover Against Barnes Under Title VII

Barnes argues that, even assuming Plaintiff can otherwise establish a prima facie case under Title VII, the court must grant summary judgment against Plaintiff as to his claim against Barnes, because Barnes was never Plaintiff's employer. Sixth Circuit precedent supports this view:

> While the law is clear that a supervisor cannot be held liable in his or her individual capacity for violations of Title VII, there is support for the proposition that a supervisor may be held liable in his or her official capacity upon a showing that he or she could be considered the 'alter ego' of the employer.

*Little v. BP Exploration & Oil Co.*, 265 F. 3d 357,362. n.2 (6th Cir. 2001). "However, 'when a corporate employer is already being sued under Title VII an official capacity adds nothing to the litigation.'" *Pettinato v. Prof'l Parent Care*, No. 16-14419, 2017 WL 2930915, at *4 (E.D. Mich. July 10, 2017) (*quoting Maudlin v. Inside Out Inc.*, 2014 WL 1342883, at *3 (S.D. Ohio 2014)). Here, just as in *Pettinato*, Plaintiff is also suing his employer, so "bringing a claim against [the individual in addition to the employer] is redundant." *Id.* Additionally, Barnes could hardly be viewed as the alter ego of Gerber. The court will therefore grant Barnes's motion for summary judgment on the Title VII claims.

### B. Adverse Employment Action

Several of Plaintiff's claims require him to establish that his employer took an adverse employment action against him. *See, e.g.*, *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (for race discrimination claims "plaintiff must show that (1) he or she was a member of a protected class; (2) he or she suffered an adverse employment action; (3) he or she was qualified for the position; and (4) he or she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."); *see also Curry v. SBC Commc'ns, Inc.*, 669 F. Supp. 2d 805, 831 (E.D. Mich. 2009) ("In order to establish a prima facie case of retaliation, a plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the exercise of his civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.").

As Plaintiff received several promotions and then voluntarily terminated his own employment at Gerber, he relies upon a theory of constructive discharge. "To constitute a constructive discharge, the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Deasfernandez v. Beaumont Health Sys.*, 154 F. Supp. 3d 534, 539–40 (E.D. Mich. 2015) (*citing Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir.1999)). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* at 540 (*citing Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). "The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." *Id.* (*citing Jenkins v. Southeastern Mich. Chapter, Am. Red Cross*, 141 Mich. App. 785, 796, 369 N.W.2d 223, 229 (1985)).

Even assuming that the conditions of Plaintiff's employment were intolerable to a reasonable person, Plaintiff has not shown that his employer *intended* to induce him to quit. In fact, Gerber apparently took steps to address the problem once Plaintiff complained and then offered Plaintiff a position at another location following his resignation. Plaintiff cites only to *Champion v. Nationwide Sec., Inc.*, which held that a supervisor's decision to rape his subordinate constituted a constructive discharge attributable to his employer contemporaneous with the use of force. 450 Mich. 702, 710, 545 N.W.2d 596, 600 (1996) *overruled by Hamed v. Wayne Cty.*, 490 Mich. 1, 803 N.W.2d 237 (2011). That case, plainly distinguishable from the one at bar where no

criminal sexual assault has occurred, was later overturned in *Hamed*, which held that

"Michigan law has never imposed liability on an employer for the unforeseeable criminal

actions of its employees, except in *Champion*." 490 Mich. at 36 ("Nor has Michigan

common law incorporated an exception based on an aided-by-agency theory of

liability.").

Plaintiff also alleges that he was paid in a manner that was discriminatory, but he

supports this contention with nothing more than rumor and innuendo. "[A] plaintiff's

testimony is itself sufficient to create a genuine issue of material fact." *Moran v. Al Basit

LLC*, 788 F.3d 201, 206 (6th Cir. 2015). However, such is not the case here. *See Pollock

v. Delphi Packard Elec. Sys.*, 24 F. App'x 252, 253 (6th Cir. 2001) ("A court cannot rely

on unsworn inadmissible hearsay when ruling on a summary judgment motion.").

Plaintiff's deposition testimony references only hearsay relayed to him by a co-worker.

No sworn deposition testimony, affidavit, or even pay stub supplied by any co-worker

substantiates his allegation of pay discrimination. He thus does not point to any

admissible evidence that would permit a reasonable jury to reach the conclusion that he

was the victim of the unlawful practice. By contrast, his testimony that he was not

supplied sufficient support staff once he was elevated to parts manager and subject to

additional scrutiny is presumably based on personal knowledge, but it is insufficient to

establish an adverse employment action. *See Smith v. Henderson*, 376 F.3d 529, 534

(6th Cir. 2004) ("[T]he manner in which the [employer] supervised and/or criticized

[plaintiff]'s job performance and assigned job duties to her, [including refusing to

authorize her to delegate work to subordinates, are] actions which normally are

insufficient to establish a constructive discharge as a matter of law."). Plaintiff is thus unable to establish an adverse employment action, so summary judgment is appropriate as to his racial discrimination and retaliation claims.

### C. Racial Harassment Claims

"Hostile work environment claims arising under Title VII and § 1981 are analyzed using the same standards." *Mathews v. Massage Green LLC*, No. 14-13040, 2016 WL 1242354, at *6 (E.D. Mich. Mar. 30, 2016) (citations omitted).

> To succeed on a claim of a racially hostile work environment, a plaintiff must demonstrate that (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on race, (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transportation Co., Inc.*, 643 F.3d 502, 511 (6th Cir. 2011) (*citing Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078–79 (6th Cir. 1999)). "The standards under Michigan's Elliott-Larsen Act are similar, except that an employer may be held liable for the creation of a hostile work environment only if it 'failed to take prompt and adequate remedial action after having been reasonably put on notice of the harassment.'" *Mathews*, 2016 WL 1242354, at *6 n.4 (*quoting Chambers v. Trettco, Inc.*, 463 Mich. 297, 614 N.W.2d 910, 915-16 (2000)).

Barnes contends that Plaintiff fails to demonstrate the fourth element, and Gerber argues that Plaintiff has not established the fifth element. No evidence suggests that Gerber knew about and failed to take action regarding the harassment. As discussed above, Gerber took quick action to investigate and address the problems once Plaintiff

reported it to the company's attention. In *Vance v. Ball State Univ.*, the Supreme Court explained vicarious liability for a supervisor's harassment in Title VII cases:

> If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.

133 S. Ct. 2434, 2439, 186 L. Ed. 2d 565 (2013). Here as discussed above, even assuming that the harassing conduct at issue was performed by a supervisor, no tangible employment action was taken. Furthermore, Plaintiff admitted during his deposition that Gerber had an employment policy in place that he could, and did, use to report harassment. (Dkt. 33-3, Pg. ID 496.) However, Gerber cannot be liable for harassment that continued because Plaintiff waited to lodge his complaint or decided against submitting a second complaint once he believed he was the subject of later harassment in the form of gestures recalling the Third Reich or a lackluster response to his concern about a racial slur written on his truck. Further, nothing suggests that Gerber's remedial efforts following the complaint were anything other than prompt and adequate. Though Plaintiff suggests that Barnes failed to live up to his promise to hold a powwow with his subordinates on racial sensitivity each Friday, management at Gerber took decisive action and apparently threatened to fire Barnes if the misconduct persisted. (Dkt. #33-3, Pg. ID 500.) Thus, summary judgment is appropriate for Plaintiff's racial harassment claims against Gerber.

Barnes attacks the severity of the alleged harassment, contending that it does not rise to the level that is actionable.[2]

> Factors to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Significantly, isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Occasional offensive utterances do not rise to the level required to create a hostile work environment. To hold otherwise would risk changing Title VII into a code of workplace civility, a result we have previously rejected.

*Williams*, 643 F.3d at 512–13 (6th Cir. 2011) (quotations and citations omitted).

Plaintiff identifies threatening statements made by a co-worker, but it appears that these were never reported to management and Plaintiff only identified one instance in which Barnes was physically present where the co-worker threatened to "tar and feather" Plaintiff. (Dkt. #27-3, Pg. ID 267.) But the Sixth Circuit has found that similarly superficially threatening conduct, though "troubling," may not support a claim if it is also isolated. *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 432-33 (6th Cir. 2014) (holding that two instances of racist jokes and an episode in which a supervisor stood behind the plaintiff and fashioned a noose out of a telephone cord did not constitute a hostile work environment).

---

[2] He also argues that Plaintiff misinterprets innocent jokes told either by Barnes or in his presence without discouragement as racial harassment. He insists that he meant nothing untoward with his own references to an affinity for chicken, bad credit history, or Plaintiff's desire to leave work early, each time pointedly referring to Plaintiff as "black." (*See* Dkt. #27-3, Pg. IDs 227, 258, 261.) The court interprets this as an effort to counter Plaintiff's establishment of the third element cited above. Needless to say, this credibility determination would be a question for the jury, so summary judgment on this point is not warranted.

The rest of the statements, including a racist "joke of the day" uttered by another co-worker in Barnes's presence, amount to "offensive utterances" such as those dismissed as non-actionable in *Williams*—"calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people should 'go back to where they came from.'" 643 F.3d at 513. It is unclear whether Barnes was present on the day that Plaintiff reported the racial epithet on his car, but Plaintiff has not provided sufficient evidence to allow a reasonable jury to conclude that Barnes was responsible for its authorship or that he deliberately ignored Plaintiff's concern over it. Plaintiff worked at Gerber for approximately a year before his resignation, and these incidents are insufficiently pervasive to support a claim. *See Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 707 (6th Cir. 2007) (affirming district court determination that "fifteen specific incidents spanning a two-year period[ . . .] were isolated and were not pervasive.").

"[T]his court has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017) (finding racially charged statements made by union leaders and statements intending to withdraw only grievances filed by African-American members not actionable under Title VII and the ELCRA). "These incidents, if true, are offensive and condemnable. But they are not actionable as a hostile work environment." *Id.* at 328. Just as the conduct in *Williams*, the behavior Plaintiff endured, and which Barnes tacitly endorsed, is "despicable," but "not sufficiently 'severe' or 'pervasive' standing alone to create a jury question of [Plaintiff]'s racially hostile work environment claim." *See id.* at 512. Therefore summary judgment as to Barnes is appropriate as well.

## D. Ethnic Intimidation Claim

Ethnic intimidation occurs in the state of Michigan under M.C.L. § 750.147b under the following conditions:

> (1) A person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of the person's race . . . does any of the following:
>
> > (a) Causes physical contact with another person.
> >
> > (b) Damages, destroys or defaces any real or personal property of another person.
> >
> > (c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur.
>
> . . .
>
> (3) [A] person who suffers injury to his or her person or damage to his or her property as a result of ethnic intimidation may bring a civil cause of action against the person who commits the offense.

M.C.L. § 750.147b.

As discussed above, Plaintiff failed to report to Gerber any of the threatening statements that he claims co-workers made to him. With the exception of the vandalism to Plaintiff's car, nothing indicates that Plaintiff actually suffered physical or property damage at the hands of Gerber or any of its employees. Plaintiff has no evidence that any of his co-workers were responsible for the vandalism besides inference based on the color of the ink, which is simply insufficient to carry his burden. The threatening statements that Plaintiff identified, for example that a co-worker planned to "run over" his truck or tar and feather him were not accompanied by—nor did they independently

produce—reasonable cause to believe that the described acts would actually occur. Summary judgment on this claim is also appropriate.

### E. Intentional Infliction of Emotional Distress

Plaintiff's claim for intentional infliction of emotional distress also fails, as the conduct giving rise to the claim must be truly outrageous beyond even the obnoxious behavior that occurred here.

> The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

*Roberts*, 422 Mich. at 603, (*quoting* Restatement Torts, 2d, § 46, comment d, pp. 72-73). The complained-of conduct here amounts to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" and thus cannot support a claim. "[R]un-of-the-mill claims of employment discrimination (as are alleged here) do not constitute extreme and outrageous conduct sufficient to state a claim of intentional infliction of emotional distress under Michigan law." *Loyd v. Sait Joseph Mercy Oakland*, 766 F.3d 580, 592 (6th Cir. 2014).

### IV. CONCLUSION

IT IS ORDERED that Gerber's Motion for Summary Judgment (Dkt. #28) is GRANTED.

IT IS FURTHER ORDERED that Barnes's Motion for Summary Judgment (Dkt. #27) is GRANTED. A separate judgment shall issue.

                                                  s/Robert H. Cleland
                                                  ROBERT H. CLELAND
                                                  UNITED STATES DISTRICT JUDGE

Dated: August 24, 2017

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 24, 2017, by electronic and/or ordinary mail.

                                                  s/Lisa Wagner
                                                  Case Manager and Deputy Clerk
                                                  (810) 292-6522